CollxNS, Judge,
delivered tbe opinion of the court:
On June 15, 1951, plaintiff, an individual doing business as George Bennett Construction Company, was awarded a contract calling for the construction of a levee and appurtenances on the Missouri River, near Kansas City, Missouri. At issue here is a matter of contract interpretation, the specific question being whether plaintiff’s view of the plans and specifications- — restricting the amount of necessary excavation to an area short of that which defendant seeks to include — was a reasonable construction of the contract. Under protest and upon the Government’s insistence, plaintiff removed 105,870 cubic yards of earth — borrow material — from the disputed area; additional compensation for this extra work is the basis of the present suit.
In the prosecution of this claim, originally heard and denied by the Corps of Engineers Claims and Appeals Board (hereinafter the “Board”), both parties, without formal objection, have proceeded to litigate the issues hi a de novo proceeding, each introducing evidence in this court not previously presented before the Board. Our trial commissioner, Franklin M. Stone, has submitted detailed findings of fact recommending that judgment be granted to plaintiff. On the basis of those findings, evaluated in light of applicable legal propositions, we conclude that plaintiff is entitled to recover.
When reduced to its essentials, the controversy between the parties involves a very narrow matter, i.e., whether the contract specifications, read in conjunction with its detailed drawings, could be interpreted by a reasonable contractor as not requiring the removal of borrow material from that portion of the riverbank situated on a line parallel to, and approximately 260 feet distant from and beyond, the levee’s centerline. To prevail on this issue, it is not essential that plaintiff demonstrate his position to be the only justifiable or reasonable one. A specification susceptible to more than one interpretation, each interpretation found to be consistent with the contract’s language and the parties’ objectively ascertainable intentions, becomes convincing proof of an ambiguity ; the burden of that ambiguity falls solely upon the party who drew the specification. Peter Kiewit Sons' Co. v. *65 United States, 109 Ct. Cl. 390 (1947). Beading tibe contract as a whole, one can be left with little doubt as to the reasonableness of plaintiff’s interpretation.
As defendant points out in its brief, a drawing can set forth the lateral limits of contemplated excavation and grading in two ways. One method would involve establishing a fixed distance from a base line as the work limit — the base line in this case being the levee’s centerline; another approach would define the extent of excavation by reference to elevation, i.e., by fixing the lowest elevation of a slope (here the base of the levee) with that elevation to be maintained laterally until it intersects (as it would here) with a natural boundary, i.e., the river.
In this case, the drawings did set out a fixed distance (i.e., 260 feet from the centerline of the levee), but it is defendant’s contention that this was not intended to fix the lateral limits of excavation. Bather, defendant claims that the 260-foot mark simply indicated the low point of the levee slope and that the elevation at that point (722 feet above sea level) was to be maintained and carried forward to the waterline— thereby encompassing the area here in dispute.
To refute this, plaintiff points out the following: (1) the disputed area was actually in the bed of the river and sub-paragraph 2.06(a)(2) of the contract permitted, hut did not require, the contractor to excavate this area if additional fill was found to be necessary; (2) the typical cross section of the area (designated on the drawings between stations 210 +40 and 242+80) indicated finished slopes and elevations by heavy lines, and such lines did not show any finished slope or elevation beyond an approximate distance of 258 feet from the levee centerline; and (3) a detailed cross sectional view of the area shows a vertical line marking the 260-foot point from the levee’s centerline — this vertical line on the drawing being indicated as the riverward limit of borrow excavation.
While plaintiff enumerates additional factors reinforcing the reasonableness of his interpretation, we find them unnecessary to sustain the legitimacy of his position. The short of the matter is that, while the Government may well have intended the contractor to continue the excavation shoreward into the disputed area, it chose a most inarticulate way *66 of describing that objective. By fixing tbe riverward limit of borrow excavation at tbe 260-foot mark, defendant fixed the limits of the excavation that it could legally insist upon. Though the drawings could perhaps have been read another way, a reasonable construction would not have suggested it. We find that plaintiff is entitled to recover for the additional work that he was required to perform.
In his report to the court, the commissioner recommended that plaintiff be granted $42,383.45 as total compensation for the additional work.[1] Plaintiff contests the adequacy of this figure and seeks instead to recover a sum in excess of $100,000. The difference between what was recommended and what is sought rests in part upon plaintiff’s disagreement with the hourly rental rates that should be applied in determining the contractor’s ownership costs in the equipment which he used in performing the disputed excavation. The commissioner’s figures were based upon the application of AGO rates;[2] plaintiff contends for the application of “force-account rates”[3] or AGO rates modified so as to reflect the greater wear and tear to which the equipment was subjected because of adverse weather conditions.
Though presented in a different factual context, a somewhat similar problem was discussed in L. L. Hall Constr. Co. v. United States, 177 Ct. Cl. 870 (Dec. 1966). In that case — which examines the question of ownership rates versus rental rates in computing delay damages — we took the position that, absent actual cost data clearly showing the specific expenses attributable to defendant’s wrongful delay, a fair and reasonable approximation could be achieved through *67 use of AGO rates applied to the acquisition cost of each piece of equipment. In our judgment, this case (which like Hall, supra, requires speculation regarding the correct measure of damages because of the absence of actual cost figures) offers no substantial reason justifying a departure from the application of average AGO rates.
Plaintiff’s reference to the aforementioned “force-account rates” is no different, in principle, from the AED rental rates rejected in Hall, supra.[4] Plaintiff was not in the business of distributing or leasing its equipment to others; thus, whatever rates might obtain under those circumstances would bear no meaningful relation to the present situation. Here the relevant inquiry is concerned solely with the determination of expenses incurred in connection with contractor-owned cmd contractor-operated equipment. The measure of plaintiff’s recovery is to be geared to Ms investment cost, i.e., the actual cost of the equipment used — reference to rental rates being neither justifiable nor meaningful under such circumstances.
Nor would use of the force-account rates (which in actuality were rental rates) recommend itself here simply as a general proposition. The force-account rates were intended to accommodate an emergency flood situation and were designed to obtain the immediate use of necessary equipment for a short term. Certainly the additional work involved in plaintiff’s claim here was not performed under circumstances of such pressing urgency as would justify our applying a damage standard which, in large measure, ignores actual investment costs. Plaintiff’s additional work was performed over a 41-day period, made difficult because of adverse weather conditions, but in no sense an emergency. An argument for the use of “force-account rates” in computing equipment expense must be rejected.
*68 Similarly, we do not consider plaintiff’s bid for the use of above-average AGC rates as a point well taken. While it is quite true that plaintiff’s equipment was subjected to greater abuse because of the adverse circumstances under which it was used, this in itself does not warrant the use of cost rates more liberal than the average AGC rate.[5]
As the commissioner’s findings show, an accurate computation of plaintiff’s actual additional costs is not possible in this case, because the relevant accounting records were destroyed. Thus the amount of damages claimed must, of necessity, remain speculative in nature. But within the limits of this we can see no reason for finding that the commissioner’s recommendations on damages were not fair to plaintiff.
In challenging the sufficiency of the recommended judgment, plaintiff ignores several important considerations. Thus, he overlooks the fact that the equipment expenses allowed here were based upon the cost of new equipment rather than plaintiff’s own investment costs. Also overlooked is the fact that all the equipment for which allowance was made was not actually in use during the entire 41-day period. This being the case, plaintiff’s contention respecting the omission of an allowance for standby time becomes meaningless. Having been paid a rate based upon the active use of all equipment for the full period involved, it necessarily follows that no additional compensation can be granted for standby time.
Our findings also show that the wage claim allowed plaintiff was based upon 6 hours of regular work and 4 hours of overtime. Though plaintiff disputes this and claims the allowance was for 8 hours at regular time and 2 hours at an overtime rate, the relevant exhibits show this not to' be so. The compensation for labor costs was, like the equipment-expense allowance, liberally construed in plaintiff’s favor.
*69 As to the remaining disputed damage issues, i.e., the question of an allowance for overhead and an allowance for profit, here we feel that plaintiff is entitled to additional consideration.
While the commissioner did consider and make allowance for the usual “field or job overhead expenses,” [6] provision should also have been made for “home office” overhead. See Luria Bros. & Co. v. United States, 177 Ct. Cl. 676, 369 F. 2d 701 (1966). Since the absence of any records precludes an accurate determination for this item of expense, we feel that an additional 5 percent allowance is warranted — this to be computed against plaintiff’s total costs of $88,966,25.[7]
As to the question of plaintiff’s entitlement to a profit on the additional work he performed, this court has asserted, in a number of decisions, that a profit may not be allowed in “breach of contract” actions. J. D. Hedin Constr. Co. v. United States, 171 Ct. Cl. 70, 347 F. 2d 235 (1965); Laburnum Constr. Corp. v. United States, 163 Ct. Cl. 339, 325 F. 2d 451 (1963); Oliver-Finnie Co. v. United States, 150 Ct. Cl. 189, 279 F. 2d 498 (1960). Both the commissioner and defendant relied upon those authorities in denying plaintiff’s entitlement to a profit in this case. We decide otherwise.
The term “breach of contract” as used in the cited authorities refers to a breach which is not actionable under the disputes clause. As to whether a prohibition against profit on such claims is warranted is a matter that need not be reexamined at this juncture. For here, the claim sued on is one which arises under the contract, i.e., it was amenable to administrative relief through the vehicle of a “constructive change”; hence the matter of damages should be treated in the same manner. Had plaintiff’s entitlement to an equitable adjustment been established at the administrative level (that is, without the need for recourse to this court), a profit on *70 the additional work would have been allowed. See Paccon, Inc., 65-2 B.C.A. ¶5227 (ASBCA No. 7890, 1965). No sound reason has been advanced to justify the application of a lesser standard of damages here.
Of course, there may be situations where the claim sued on, though “arising under the contract,” would nevertheless not entitle the contractor to a profit allowance. But where, as here, the Government exacts a measure of performance which the contract (pursuant to a reasonable interpretation) did not call for, then the additional work entitles the contractor to additional profit. The key is always to put the contractor in as good a position as he would have been but for the defendant’s wrongful action. In this case, that point cannot be achieved if the profit to be allowed is to be limited to the contract price alone. Accordingly, it is our judgment that the allowance of a 6 percent profit on the additional work will provide plaintiff with a reasonably just return.
There remains to be considered defendant’s contention respecting the inappropriateness of the de novo proceeding held in this court. Its argument in this connection is that the decision in United States v. Carlo Bianchi & Co., 373 U.S. 709 (1963), requires us to limit our review to the administrative record — this despite the fact that no objection to de novo proceedings was taken until after the close of proof.
The rationale of Bianchi and its progeny, United States v. Utah Constr. & Mining Co., 384 U.S. 394 (1966), and United States v. Anthony Grace & Sons, Inc., 384 U.S. 424 (1966), shows quite clearly that where a claim is one which is susceptible to administrative relief (i.e., where relief can be had through one or more of the standard “adjustment” clauses), then factual determinations relative to such claim are within the scope of the “disputes” clause and therefore within the province of the administrative fact finder. On appeal to this court, the legal sufficiency of administratively ascertained facts is to be judged in light of the Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§321, 322 (1964), and not in terms of any new evidence. But that limitation does not obtain when, as here, both parties have proceeded to introduce new evidence to which the Government makes no ob *71 jection until tbe trial proceedings have ended. Where such is the case, it is proper to regard the introduction of new evidence as a waiver of the right to insist upon strict adherence to the normal disputes procedure. The Government’s (or the plaintiff’s) right to a judicial review limited to the administrative record is a procedural right — it is not jurisdictional — and it may therefore be waived. Stein Bros. Mfg. Co. v. United States 162 Ct. Cl. 802, 337 F. 2d 861 (1963). See also National Presto Indus., Inc. v. United States, 167 Ct. Cl. 749, 755, footnote 2, 338 F. 2d 99, 103 (1964), cert. denied, 380 U.S. 962 (1965). Considerations essentially identical to those raised here were presented in WBB Corp. v. United States, 177 Ct. Cl. 909 (Dec. 1966). We held there that the Government’s full and active participation in de novo proceedings before this court, undertaken without objection until after the close of proof, constituted a waiver of its contractual right to insist upon an initial administrative evaluation. This case stands on the same footing; we therefore reject defendant’s contention that the de novo proceedings were, in this situation, contrary to the teachings of the trilogy.
To summarize, we hold that plaintiff’s construction of the contract specifications was reasonable; the additional work which he was required to perform entitles him to damage figures as determined by our commissioner, subject to the indicated modifications for home office overhead and profit allowance. Further we hold, for the reasons indicated, that defendant’s belatedly asserted challenge to the propriety of de novo proceedings is to be rejected on the ground of waiver.
Plaintiff is entitled to recover the sum of $52,436.63, and judgment is entered for that amount.[8]
*72 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Franklin M. Stone, and the briefs and argument of counsel, makes findings of fact as follows:
INVITATION EOE BIDS, AWARD OE CONTRACT AND CHANGE ORDERS
1. On April 10, 1951, the Department of the Army, through the Corps of Engineers, issued invitations for bids for “Construction of Levee and Appurtenances, Section II, North Kansas City Unit, Kansas City Flood Control Project, North Kansas City, Missouri.” The work to be performed under the contract included the construction of a new levee, the raising of an existing levee, construction of pumping plants, the placing of stone protection, seeding levee crown and slopes, and the clearing, grubbing and construction of drainage structures. The area in which the contract work was to be performed was located along the left bank of the Missouri River in the vicinity of North Kansas City, Missouri, beginning at the Hannibal Bridge, extending downstream to Rock Creek, thence north to the Wabash and C.B. & Q.R.R. tracks and then northwesterly to a point just east of U.S. Highway 69.
2. On June 5, 1951, plaintiff, an individual doing business as George Bennett Construction Company (sometimes hereinafter referred to as “Bennett Company”), submitted a bid in the amount of $1,984,628.50 and, as low bidder, was awarded Contract No. DA-23-028-Eng-631 (hereinafter referred to as Contract-631) on June 15, 1951, for said amount. Under the terms of the contract, plaintiff was to commence work within thirty days after receipt of notice to proceed, and to complete the project within 650 days thereafter. By letter dated June 21, 1951, plaintiff was notified to proceed immediately. Plaintiff acknowledged receipt of this notice on June 25, 1951, and commenced work shortly thereafter. Subsequent change orders increased the original contract price by an additional sum of $148,746.78, making a total contract consideration of $2,133,375.28. The change orders *73 also included time extensions of 535 days, for a total performance period of 1,185 days. The contract work was completed on October 12, 1954, within the allotted time.
CONTRACT PROVISIONS AND SPECIFICATIONS
3. (a) The contract[1] contained, inter alia, the following pertinent provisions:
ARTICLE 2. Specifications and Drawings. — The Contractor shall keep on the work a copy of the drawings and specifications and shall at all times give the Contracting Officer access thereto. Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as is shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern. In any case of discrepancy in the figures, drawings, or specifications, the matter shall be immediately submitted to the Contracting Officer, without whose decision said discrepancy shall not be adjusted by the Contractor, save only at his own risk and expense. The Contracting Officer shall furnish from time to time such detail drawings and other information as he may consider necessary, unless otherwise provided.
Article 3. Changes and Extras. — The Contracting Officer may at any time, in writing, and without notice to the sureties, order extras or make changes in the drawings and/or specifications of this contract providing such extras or changes are within the general scope thereof. If such extras or changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this article must be asserted in writing within 30 days from the date the extra or change is ordered: Provided, however, That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and, subject to such approval as the head of the department may require, adjust any such claim asserted at any time prior to the date of final *74 settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 6 nereof. But nothing provided in this article shall excuse the Contractor from proceeding with the prosecution of the work.
AjRticle 4. Qhanged conditions. — Should the Contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent physical conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown physical conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the Contracting Officer shall be notified immediately in writing of such conditions before they are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ, the contract shall, subject to such approval as the head of the department may require, be modified to provide for an equitable adjustment in contract price and/or difference in time resulting from such conditions. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Article 6 hereof.
Article 5. Delays-Damages.— (a) Termination for Default. — -If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such dili-Íence as will insure its completion within the time speci-ed in the contract, or any extension thereof, or fails to complete said work _within such time, the Government may, by written notice to the Contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the Contractor and his sureties shall be liable to the Government for any excess costs occasioned the Government thereby, as well as for liquidated damages for delay, as fixed in the specifications or accompanymg papers, for such reasonable time as may be required to complete the work, or if liquidated damages are not so fixed, the Contractor and his sureties shall be liable to the Government for any actual damages occasioned by such delays. If the Contractor’s right to proceed is so terminated, the Government may take possession of and utilize for completing *75 the work such material, appliances, and plant as may be on the site of the work and necessary therefor.
(b) Damages for Delay. — If the Government does not terminate the right of the Contractor to proceed, as provided in this article, the Contractor shall continue the work, in which event he and his sureties shall be liable to the Government, in the amount set forth in the specifications or accompanying papers, for liquidated damages for each calendar day of delay until the work is completed, or if such liquidated damages are not so fixed, any actual damages occasioned by the delay.
(c) Time Extensions. — The right of the Contractor to proceed shall not be terminated as provided in this article, nor the Contractor charged with liquidated, or actual damages, because of any delays in the completion of the work due to causes beyond his control and without his fault or negligence, including, but not restricted to, acts of Godj or of the public enemy, acts of the Government, either m its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargo, and unusually severe weather, or delays of subcontractors due to such causes; provided however, that the Contractor shall promptly notify the Contracting Officer in writing of the causes of such delay. Upon receipt of such notification the Contracting Officer shall ascertain the facts and the extent of such delay and, if in his judgment the facts so justify, shall extend the time for completing the work commensurate with the period of excusable delay. The Contracting Officer’s findings of fact thereon shall constitute his decision which shall be final and conclusive on the parties hereto subject to appeal by the contractor within thirty (30) days therefrom as provided in the “Disputes” Article herein.
Articee 6. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer subject to written appeal by the Contractor within 30 days to the head of the department concerned or his duly authorized representative whose decision shall be final and conclusive upon the parties hereto. In the meantime the Contractor shall diligently proceed with the work as directed.
*76 SC-3. Estimated Quantities. The quantities listed below are estimates only. Within the limit of available funds the Contractor will be required to complete the work specified herein in accordance with the contract and at the contract price or prices whether it involves quantities greater or less than the following estimates provided that, should the actual quantity of work performed under any item vary from the estimated quantity by more than 20%, an adjustment in the unit price for any such item be made on the following basis. Where the actual quantities of work for an item exceed by more than 20% the estimated quantities stated in this contract for such item either party to this contract may make demand for negotiation for a new unit price for the actual quantity of work that is in excess of the estimated quantity plus 20% thereof. Where the actual final quantity of work for an item is less than the estimated quantity stated hi the contract by more than 20% the Contractor will be paid at the contract unit price for that item for the actual quantities of work performed and, in addition, may request compensation in an amount sufficient to provide a reasonable allowance for the loss of indirect costs on the quantity of work represented by the difference between the actual quantity and the estimated quantity of work less 20% thereof. In the event of a dispute as to the amount of any adjustment under this paragraph the matter shall be treated as a question of fact to be determined in accordance with the “Disputes” article of this contract.

$ $ ‡ *
(b) Subparagraphs 2-06a (2) and (3) of the contract specifications in the Invitation for Bids originally read as follows:
(2) The sources of materials shall be as follows:

*77
Station

210+20 to 387+03.
391+00 to 469+11.

Source

Existing levee and foreshore to ap-groximate limits shown on the rawings, New Rock Creek Channel trench, structural or other required excavation.
Hillside borrow pit in the vicinity of station 400+00 shown on the drawings, trench, structural or other required excavation.
In the event sufficient material for the landside berm is not available in the above sources and to depths shown on the drawings, additional material shall be obtained from the streambed of the Missouri River, between approximate station 212+00 and approximate station 237+50, by hydraulic methods. In obtaining material by hydraulic methods, no material shall be obtained within 260 feet of the center line of the levee (measured normal to center line of levee) nor within 200 feet of existing bridge piers, dikes, or revetment. The Contractor may, if he so elects, obtain material subject to approval of the Contracting Officer from other sources obtained by him at no expense to the Government in lieu of the Hillside borrow pit shown on the drawing.
(3) It is the intent of these specifications to utilize, in the levee and landside berm, all acceptable material available within the limits designated on the drawings and typical cross sections as borrow, including toe trench for riprap, cut-off trench, and drainage structure excavation. It shall be the responsibility of the Contractor to coordinate his work in a manner that the various classes of material excavated shall be incorporated in their respective zones as shown on the drawings or as directed by the Contracting Officer.
(c) Addendum No. 1, dated May 17, 1951, modified the above provision as follows:
* * * Subparagraph %-06a($). In line 3 below the tabulation of sources of materials, the word “shall” is deleted and the word “may” is inserted therefor.
* * * Subparagraph %-06a{3). The first sentence of this subparagraph is deleted and the following is inserted therefor: “It is the intent of these specifications to complete the construction of the levee and landside berm between stations 210+40± and 387+03 with materials removed from the foreshore bar along the Missouri River and from the excavation of Rock Creek *78 Channel. Unless otherwise approved by the Contracting Officer, the Contractor shall utilize, in the levee and landside berm, all acceptable material from the foreshore bar between stations 200+00± and 346+50± and riverward of the finished levee slope between stations 390+87± and 469+11.05 and all materials, acceptable and/or objectionable, shall be removed to the slopes and elevations shown and designated on the drawings and typical cross sections as borrow, including toe trench for riprap, cut-off trench and drainage structure excavation.”
(d) It is apparent that the above-quoted change in Sub-paragraph 2-06a(2), supra, removed the mandatory requirement under the original version of Subparagraph a (2) that additional borrow material needed be obtained from the streambed of the river between stations 212+00 and 237+50 by hydraulic means riverward of the line 260 feet from the centerline of the new levee. Thus, it would appear that as a result of the change, the contractor was not required under the contract to engage in dredging operations in the disputed area for the purpose of obtaining borrow material, if there was insufficient material within the 260-foot line. The date of May 24, 1951, originally set for the opening of bids, was not changed by Addendum No. 1.
(e) On May 21, 1951, Addendum No. 2 was issued, which postponed the May 24, 1951 date for the opening of bids for “approximately two weeks”. Defendant was to set a new bid opening date by a subsequent addendum.
(f) The above positions (set forth in (c), supra), were again amended by Addendum No. 3, dated May 28, 1951, as follows:[2]
* * * Subparagraphs %-06a(%) and 2-06a(S). These subparagraphs, as previously modified by Addendum No. 1, are deleted and the following is inserted therefor:
“(2) The materials for the construction of the levee and landside berm shall be obtained from the following sources:
“ (a) Existing levee and foreshore to the limits shown on the drawings, New Bock Creek Channel, trench, structural or other required excavation.
“(b) Hillside borrow pit in the vicinity of station 400+00 as shown on the drawings.
*79 “ (c) In the event sufficient material for the landside berm is not available in the above sources, and to depths shown on the drawings, additional material .may be obtained from the streambed of the Missouri River. However, no material shall be obtained within 260 feet of the centerline of the levee (measured normal to C/L of levee) nor within 200 feet of existing bridge piers, dikes or revetment.
“(d) The Contractor may, when approved by the Contracting Officer, obtain material from other sources obtained by him at no expense to the Government.
“(3) The Contractor shall remove all materials, whether acceptable or objectionable as levee or berm fill, from the foreshore bar between stations 200+00 ±; and 346+50 ± to the slopes and elevations shown and designated on the drawings and typical sections as borrow, including trenches for riprap, rock-fill toe and rock-fill dikes; and riverward of the finished levee slope between stations 390+ 87 and 469+11.05. It is the intent of these specifications to utilize all acceptable material removed as noted above and that obtained from cut-off trench and drainage structure excavation in the construction of the levee and landside berm. If, subsequent to the completion of the excavation and placement of the rip-rap, rock-fill toe and rock-fill dikes in any portion of the work between stations 210+40 and 346+00 ± and prior to the completion and acceptance of the work under this contract, additional material is deposited by natural river action above the finished lines and grades shown on the drawings, removal of this additional material, wholly or in part, may be required by the Contracting Officer, in which event payment for the work will be made in accordance with Article 3 of the contract.”
(g) The original specifications, under the heading “Earthwork”, contained the following provisions:
* * * * *
2-11. Borrow Areas, a. General. The material for the construction of the levee shall be obtained and distributed as outlined in subparagraph 2-06a(2).
(2) The limits of borrow excavation from a point approximately 1,000 feet upstream from the Hannibal bridge to approximate station 387+03 shall be as shown on the drawings or as modified for additional material.
*80 c. Measurement and Payment. Excavation of material in borrow areas will not be measured for direct payment but the cost thereof shall be included in the applicable contract unit price for “Impervious Fill,” “Random Fill,” and “Pervious Drain Fill.”
NATURE OE THE SUIT
4. Plaintiff claims in this action that he is entitled to additional compensation for removing and hauling, at the direction of defendant’s contracting officer and under protest, a number of cubic yards of borrow material from an area which plaintiff contends, and defendant disputes, is outside the limits of required construction. The controversy between the parties presents a question of interpretation of the contract plans and specifications. It is the position of the plaintiff that he reasonably interpreted the contract plans and specifications as requiring borrow material to be removed from the foreshore area riverward from the new levee between station 210+40 and 242+80 only to a line parallel with, and approximately 260 feet distant from the levee cen-terline, and not, as contended by defendant, to intersection of elevation 722.0 with the riverbank. In short, plaintiff contends that the removal of borrow material from the disputed area[3] involved extra work not covered by the contract.
plaintiee’s interpretation oe contract plans and SPECIFICATIONS
5. (a) Mr. Andrew C. Elson, a construction engineer, testified on behalf of plaintiff at the trial, both as a participant in the preparation of plaintiff’s bid and as an expert witness. Elson was chief engineer of the Bennett Company and the person in charge of the estimating and engineering for the Bennett Company. At the time plaintiff’s bid was prepared, Elson had from 10 to 12 years’ experience in preparing bid estimates for work of the nature involved in this case. Elson, who left the employ of the plaintiff about April 1954, was employed, at the time of the trial, by another construc *81 tion company and engaged in tbe same kind of work he had performed for plaintiff.
(b) Elson examined both the original and amended contract specifications and plans in connection with the preparation of the bid which plaintiff submitted. On Sheet No. 8 of the plans originally furnished to plaintiff,[4] Elson observed a note which reads “For riverward limit of borrow excavation and construction R/W [right-of-way] limit see typical section.” He referred to the typical cross sections on Sheet No. 8. One of the typical cross sections related to the area from station 210+40 to station 242+80, and Elson observed a vertical dash-dot line which was labeled “River-ward limit of borrow excavation and construction R/W limit.” An arrow on the cross section points to the 260-foot line. The typical section was drawn to scale. (The same dash-dot vertical line, similarly labeled, also appeared approximately 215 feet riverward on the typical cross section for station 242+80 to station 257+00.)
On the basis of the foregoing and for other reasons set out hereinafter, Elson concluded that the vertical dash-dot line on the typical cross section for station 210+40 to station 242+80 showed the riverward limit of required excavation; that the riverward limit of borrow excavation and construction right-of-way limit between station 210+40 and station 242+80 was a line 260 feet distant from and parallel to the centerline of the new levee; and that the plans and specifications did not require excavation to “daylight” from approximately 260 feet from the centerline of the levee. These requirements appeared clear and unambiguous to Elson[5] for the following reasons: (1) There was no mandatory requirement in the contract that the disputed area be excavated; (2) *82 excavation was required only to the slopes and elevations shown on the drawings and typical cross sections; (8) the typical cross section of the area between stations 210+40 and 242+80 indicated finished slopes and elevations by heavy lines and such lines did not show any finished slope or elevation beyond approximately 258 feet from the levee centerline; (4) the finished slopes and elevations halted on the scale drawing at the dash-dot vertical line designated as the river-ward limit of borrow excavation; (5) the typical cross section shows a vertical line which marks the riverward limit of the job between stations 210+40 and 242 + 80 at a point 260 feet distant from the levee centerline; and (6) Subparagraph 2.06a (2) (c) of the specifications provides that material may be obtained from the streambed of the river, but refers to 260 feet of the centerline of the levee. No limit upon the depth of excavation beyond 260 feet is established, rather, material may be obtained to any depth below elevation 722 the contractor might select, if he wished to obtain material from that source.
6. Mr. Gordon Arnett, a civil engineer who at all times material here was employed by the Bennett Company, assisted in the preparation of plaintiff’s bid. Arnett testified on behalf of the plaintiff at the trial and it is clear that he, as well as Elson, during the preparation of the bid submitted by the Bennett Company, construed the final contract specifications and drawings as not requiring excavation of the foreshore bar between station 210+40 and 242+80 riverward of a line approximately 260 feet distant from the centerline of the new levee. Plaintiff construed the specifications and plans as permitting or allowing plaintiff to remove material from the aforesaid foreshore bar area if the company, at its option, should consider it desirable to do so.
PLAINTEEP’S PREBID ACTIONS AND ESTIMATES
7. (a) In connection with the preparation of plaintiff’s bid, Elson also examined the plans and specifications in order to determine how much borrow material would be required for construction of the new levee, ascertained the sources and locations of fill earth required, and, thereafter, directly *83 supervised the work of survey personnel who drilled and cross-sectioned various designated borrow pits and areas for the purpose of determining how much and what kind of material was available for use by plaintiff.
(b) Plaintiff estimated that it would be necessary to have 2,119,890 cubic yards of random, pervious and impervious, borrow material. The Bennett Company determined from the cross sections made during the above-mentioned survey that 2,105,793 cubic yards of material was available from the old levee and riverward borrow area located within the 260-foot line; that 54,657 cubic yards were available from the Bock Creek Channel trench; and that, therefore, it would be necessary to obtain the remainder of the material, i.e., 277,423 cubic yards, from the “hillside” borrow area supplied by the government at the downstream end of the contract work, unless plaintiff decided it would be good engineering and construction practice to obtain material from areas riverward of the 260-foot line which, under plaintiff’s interpretation of the contract, the contractor had the option to do. The contract did not require that plaintiff obtain a specific amount of material from the hillside borrow area which involved a larger haul than from other designated sources.
(c) On the basis of the foregoing, it was determined that more than the estimated quantity of earth required for construction of the new levee was available from areas other than the sand bar riverward of the 260-foot line.
(d) As best it can be determined from conflicting testimony, it appears that the disputed area, i.e., the area located riverward beyond the 260-foot line, also was cross-sectioned, at least in substantial part, during the course of the surveys made by Bennett Company personnel prior to the time1 plaintiff submitted his bid, and that such cross-sectioning probably was done prior to the time the specifications were changed by Addendum No. 3, dated May 28, 1951, because under the first version of the contract specifications,[6] it would have been necessary to dredge the area, if there was not *84 enough material within the 260-foot line. It is clear from Elson’s testimony that he considered it desirable to have as much information as possible concerning the conditions in the disputed area, and it is reasonable to conclude that most, if not all, of such area was cross-sectioned by plaintiff sometime before the Bennett Company’s bid was submitted.
8. In preparing its bid estimate and bid, the Bennett Company considered the final slopes and grades that would be required, in order to determine where earth would have to be excavated and where filling would be needed. By examining Sheet No. 8 of the plans, Elson determined that the contract called for excavation in the area between station 210+40 and station 242+80 on the riverward side of the levee to elevation 738 at the toe of the levee, which was 70 feet from the centerline of the levee; thence to continue riverward on approximately a one percent slope to a point 220 feet from the centerline of the levee; thence downward on a 1 on 2 slope to elevation 722; thence riverward at elevation 722 to the construction right-of-way limit approximately 258 feet from the centerline of the levee, and then up vertical to the existing ground level. After establishing the required final slopes and grades as outlined above, and having determined the availability and location of earth needed to construct the new levee to such slopes and grades, the Bennett Company then computed the average distance required to haul earth in the borrow areas to the new levee construction. The location of available earth was balanced with the requirements for earth in the new levee construction so that earth which the contract required to be removed would be placed in the nearest available place in the new levee.
9. The Bennett Company did not include in any of its pre-bid computations tire material on the foreshore bar riverward of 260 feet from the levee centerline between stations 210+40 and 242+80. The reason for not doing so was because (as set forth in finding 6, supra) plaintiff had determined, by survey-investigations and cross-sectioning of the old levee and the borrow areas, that there was sufficient material available at the designated sources, making it unnecessary to obtain material by dredging from the streambed between sta *85 tions 212+00 and. 237+50 riverward of a line 260 feet from the centerline of the new levee.
10. As a result of plaintiff’s prebid surveys, investigations and estimates, made in light of the Bennett Company’s understanding of the contract requirements, as it interpreted the plans and specifications, the company submitted its bid on a basis of an average cost of 44 cents per cubic yard of earth excavated, hauled and placed in the new levee. On the basis of the evidence of record, it is reasonable to find that if the company had interpreted the plans and specifications to require excavation of the foreshore bar area between stations 210+40 and 242+80 beyond the 260-foot line to an elevation of 722, it would have planned and performed the work in such a manner as to minimize expenses, and possibly would have increased its unit bid because of the proximity of the disputed area to the streambed.
11. On June 26, 1951, the Missouri River flooded and this incident, combined with severe weather, caused a delay of 50 days. By Change Order No. 2, the contract completion date was extended 50 days.
PLANNING, COMMENCEMENT AND PART PEREOEMANCE OP WORK
12. On July 6, 1951, plaintiff, principally through a subcontractor, Mr. Robert Duvall, started grubbing and clearing brush, old shacks, and various other obstructions from the disputed borrow area. That work was performed in substantial part by Duvall during July, August and September 1951, under direct instructions from C. R. Perry, defendant’s project engineer. It appears that on or about September 28, 1951, Duvall suffered a serious injury that subsequently proved fatal and, following that incident, plaintiff took over the cleanup work that remained to be done.
13. The Bennett Company initially planned and balanced the contract work in accordance with plaintiff’s interpretation of the contract plans and specifications, under which it understood that the material in the disputed area would not have to be excavated. Plaintiff never construed the contract as requiring removal of material from the disputed area to elevation 722. Plaintiff programmed its excavation on an upstream to downstream basis.
*86 14. (a) Early in July 1951, plaintiff started work at tbe upstream end of tbe new levee site near tbe Hannibal Bridge at about station 210 and generally worked downstream toward tbe A-S-B Bridge located about 3000 feet to tbe east at approximately station 240. While tbe record is not entirely clear with respect to tbe time the work was performed, it appears that the bulk of tbe new levee was constructed between those two bridges during about a two-month period from July to September 1951. During that time, plaintiff built the new levee out to only approximately 220 feet river-ward of the centerline. Plaintiff did not complete excavation of the rock-fill toe trench from about 220 feet out to 260 feet, nor finish final excavation of the 1 on 2 slope down to elevation 722 and then on out to 260 feet. Although plaintiff left the above-mentioned excavation work for a later time, the material that was not excavated was reserved for future back fill around the berms and pump house that required excavation and construction.
(b) The evidence shows that on July 10, 1951, plaintiff commenced excavation work for a cut-off trench east of the A-S-B Bridge at about station 248+50, working upstream; and that plaintiff performed some levee construction work on both sides of the A-S-B Bridge at times during the summer and early fall of 1951. However, it is reasonably clear from the record that, in general, plaintiff worked from the upstream to the downstream, i.e., from the west to the east, and completed construction of the bulk of the new levee between the Hannibal and A-S-B Bridges before performing the main work required under the contract at the downstream end of the project.
REMOVAL OE MATERIAL FROM DISPUTED AREA BT PLAINTIEE AND ANOTHER GOVERNMENT CONTRACTOR
15. On July 14, 1951, the Missouri Elver again flooded and the highest water on record was noted on said date. On July 31, 1951, the Bennett Company, with the approval of the government, removed some fill, consisting of sand, silt and other earth material, which had been deposited on the foreshore bar during the above-mentioned high water. Plaintiff used said *87 material on an embankment in connection with performance of a private contract plaintiff had with the Wabash, Chicago, Burlington and Quincy Bailroad. It is not clear from the record that all of the material plaintiff hauled to the above-named railroad worksite was removed from the disputed borrow area. The record does show that defendant’s project engineer permitted plaintiff to take the material in question with the understanding that if the material was ever needed in completion of the contract, it would be furnished by plaintiff at no charge to defendant.
16. (a) Sometime in about August 1951, Bennett Company employees, at the direction of a Mr. Smart, one of plaintiff’s superintendents, excavated material from the disputed area. It appears that the extent of the excavation was the removal of the old levee and sloping of the foreshore bar which allowed drainage of the entire surface away from the toe of the levee and prevented the impounding of water back of the borrow area. The excavated material was used in construction of the new levee and berms adjacent thereto. Smart’s action was taken on his own initiative, without any knowledge on the part of his superiors. It appears that Smart did not construe the plans and specifications as requiring plaintiff to excavate beyond the 260-foot line but that he thought plaintiff had a right to do so, and that Smart proceeded to remove the material simply because it looked good. As soon as Mr. Elson, who had been away from the job for approximately two weeks, observed the company’s scrapers taking material from beyond the 260-foot line, he called this matter to Bennett’s attention and “told him the way the job was balanced we had no business to take anything beyond that [260-foot] line, and we didn’t need any, and we should not go beyond that line.” Bennett then took this matter up with Smart, the equipment was removed from the area, and operations in the area ceased.
(b) By “balancing” the job, Elson meant that excavation was planned in such a manner as to conform to plaintiff’s hauling plan which was worked up in a manner that would result in a minimum average length of haul, thereby reducing expense.
*88 17. On August 29, 1951, defendant’s project engineer, instructed the Perry McGlone Construction Company to “excavate the Borrow area #5 to an Elevation of 738.0 at the Bock toe of Levee and slope 1% to Biver . . It appears that said company used the material excavated in accordance with the above-stated instructions for use in another government project. The record is not entirely clear, but as best it can be determined therefrom, a total of approximately 11,000 cubic yards of material was removed from said area by the McGlone Company about that time, or at some later date.
LOSS OP BORROW MATERIAL
18. In April 1952, the Missouri Biver again flooded. As a result of that flood, the river cut out and washed away approximately 567,799 cubic yards of borrow material which plaintiff had anticipated would be available for use in completing construction of the new levee.[7]
BALES AND KITE CONTRACT FOR ENLARGEMENT OF ROCK-FILL TOE TRENCH
19. (a) After the flood in April 1952, the Corps of Engineers decided to enlarge and deepen the rock-fill toe trench at the base of the levee. The Bennett Company had already substantially completed this toe trench between the Hannibal and A-S-B Bridges prior to the 1952 flood. However, as a result of experience during the flood, the deepening of the toe trench was deemed necessary by the government.
(b) The contract and specifications for deepening the toe trench, Contract No. DA 23-028-ENG-1516 (hereinafter referred to as “Contract 1516”), were prepared in September of 1952. Mr. John M. McCann, a supervising civil engineer with the Corps of Engineers, participated in the preparation of that contract, as well as the Bennett Contract No. 631, and the plans and specifications for both of these contracts were prepared by, or under the supervision of, McCann who *89 coordinated them with the various segments of the Corps of Engineers that were responsible for the work. Contract 1516, which provided for a modification of a portion of the levee which the Bennett Company had already completed by the fall of 1952, contained the following provisions regarding the wasting of the earth which was to be excavated from the enlarged and deepened toe trench:
1-04. Disposal of Excavated Material. Materials required to be excavated, other than that required for the leveling of the berm between stations 203+80± and 208+07, may be wasted along the foreshore, riverward of the rock fill toe, or, if the Contractor so elects, after the disposal of the rock and broken concrete described in Section 2, he may waste the material over the rock fill toe. In lieu of wasting the material as described above, the Contractor may, at his option, dispose of the material at other locations approved by the Contracting Officer or through other sources arranged for, by and at the expense of the Contractor.
Paragraph 1-03 of Contract 1516 provided in relevant part:
* * * All operations in connection * * * [with the excavation] shall be performed in accordance with a plan of operations approved by the Contracting Officer.
(c) Plaintiff makes the conclusionary contention that the above-quoted provisions of Contract 1516, providing for the wasting of excavated earth on the foreshore, riverward of the newly enlarged toe trench, were consistent with the Bennett Company’s interpretation of Contract 631 as not requiring excavation of the foreshore area riverward of the 260-foot line.
(d) George Bennett Construction Company submitted a bid on Contract 1516; but the contract was awarded to Bales & Kite, as the low bidders on November 3, 1952.[8]
*90 COMPLETION OF UNFINISHED CONTRACT WORK
20. On or about December 4, 1952, the Bennett Company returned to the levee area near the Hannibal Bridge, at approximately station 210+00, to complete the work it had left unfinished in about September 1951. It excavated the final 1 on 2 slope to elevation 722, and out to the 260-foot line. Plaintiff worked downstream, toward the A-S-B Bridge, finishing the grading in this area as the Bennett Company understood the plans and specifications to require. No question regarding this procedure was raised by the government from July 1951 through December 12, 1952. The contracting officer’s project engineer, C. B. Perry, often made suggestions on proper procedure, but never questioned the contractor’s interpretation in this area until on or about December 12,1952.
dispute BETWEEN PARTIES RE CONTRACT REQUIREMENTS
21. By early December 1952, the loss of material resulting from the April 1952 flood evidenced itself to the parties, or in the words of the defendant’s project engineer, Mr. Perry, “was just catching up with us at that time”. Because of the shortage of borrow material, the question arose as to the availability of additional borrow. About December 12, 1952, Perry first brought up with Elson and Jim Supica, another employee of the Bennett Company, the matter of obtaining additional borrow from the sandbar in the foreshore area riverward of the 260-foot line between the Hannibal and A-S-B Bridges, and suggested that, under the contract, the *91 Bennett Company was “obligated to remove all material above 722.0 riverward of the point where the 1 on 2 slope line from 220 feet riverward of the levee [centerline] intersects 722.0”. This was the first time such an interpretation of the contract had ever been advanced or communicated by defendant to plaintiff, and Elson, on behalf of the George Bennett Company, indicated that the work would not be done beyond approximately 260 feet riverward of the centerline.
22. Thereafter, on December 18, 1952, George Bennett wrote a letter to the project engineer which reads as follows:
Reference is made to the limits of the borrow area lying between the Hannibal and ASB Bridges on the noted project.
_ We interpret the plans to mean that our riverward limits of borrow excavation between Sta. 210+40 to 242 + 80 is the line shown on the typical section approximately 260 feet riverward of centerline.
We propose to excavate as typical section shown on a 1 on 2 slope starting at 220 feet riverward of centerline to the elevation 722.0 and then riverward to the line shown as riverward limit of borrow excavation and construction R/W limit.
If any excavation is required beyond these limits as stated above we shall expect a modification to the original contract.
23. While this dispute as to the requirements of the contract was pending, the Bennett Company continued completing the levee out to about the 260-foot line in accordance with its interpretation of the contract requirements. By December 24, 1952, plaintiff had nearly completed its work between the Hannibal and A-S-B Bridges. Under date of December 24, 1952, Mr. Perry, as the contracting officer’s representative, wrote a letter to plaintiff which reads as follows:
Receipt is acknowledged of your letter, dated 18 December 1952, relative to the limits of the foreshore borrow area lying between the Hannibal and A. S. B. Bridges in connection with your Contract No. DA-23-028-eng-631 for construction of levee and appurtenances, Section II, North Kansas City Unit.
Information is furnished that this office interprets the contract plans and specifications (specifically paragraph *92 2-06a(3) of the specifications and the typical cross section, Station 210+40 to Station 242+80, on Sheet 8 of the contract plans) as requiring the excavation of the foreshore borrow to elevation 738.0 at the levee toe with approximately 1% slope riverward to a point 220 feet riverward of the levee centerline, down on 1 on 2 slope to elevation 722.0, then riverward at elevation 722.0 to intersection with the river bank.
In view of the above, it is not necessary to modify the original contract.
removal oe material erom disputed area BT BLAINTIEE UNDER PROTEST
24. Thereafter, on or about December 24, 1952, the Bennett Company, under protest, proceeded to remove the foreshore bar area down to elevation 722 between the Hannibal and A-S-B Bridges in line with defendant’s interpretation of the contract set forth in Mr. Perry’s letter of the same date. Bales & Kite had moved a dragline into the area on November 7, 1952, but as of December 24, 1952, said company had not come into the area for the purpose of enlarging the toe trench under its contract with defendant.
25. On January 8, 1953, Perry requested the Bennett Company to move to the upstream limit of the foreshore bar, near the Hannibal Bridge, and work downstream; complete the remaining excavation work for the toe trench; and then excavate beyond the 260-foot line to elevation 722, in order to release the area to Bales & Kite for the purpose of coming in to extend and deepen the toe trench pursuant to Contract No. 1516. The Bennett Company complied with that request.
26. The parties are in agreement that between December 24, 1952 and February 2, 1953, the Bennett Company removed, under protest and at the direction of the contracting officer, 105,870 cubic yards of material from the foreshore bar riverward of the 260-foot line, i.e., the disputed area.[9] During December 1952, and January and February 1953, plain *93 tiff bauled this material an average of 7,900 feet and used it in the landside berm of the new levee. In preparing its bid, the Bennett Company estimated that its average haul for excavation under the contract would be 800 feet. In connection with the foregoing, the record discloses that the distance between the A-S-B and the Hannibal Bridges (stations 210+00 to 240+00) was approximately 3,000 feet. As most of the foreshore bar area was at the lower end, the midpoint being approximately at station 210+50, the average distance from the midpoint of the levee work between those two bridges was about 1,450 feet. However, at the time plaintiff was required to excavate from the disputed area, the adjacent levee already had been completed; therefore, it is clear that the borrow taken from said area had to be hauled for use elsewhere.
27. After the Bennett Company completed excavation in the disputed area, there remained, beyond the 260-foot line, a flat, smooth grade down to elevation 722. It appears from the record that it might be anticipated that this area would be below the water level of the river for about nine months of each year; that, therefore, the area would be part of the submerged streambed of the river a major part of the year; and that the area would not retain its slope or contour for any substantial length of time.
28. Although McCann (mentioned in finding 19 (b), supra) testified at the trial that it was always the unchanged intent of Contract 631 to have a “nice, finished, graded, level area” at elevation 722 riverward of a line approximately 245 feet from the levee centerline, it is clear that under Section 1-04 of Contract 1516, relating to enlargement of the trench, Bales & Kite had the option to waste material over this same area from which the Bennett Company had just been required to remove 105,870 cubic yards of material, ibid. There was no limitation in Contract 1516 on how far river-ward of the toe trench Bales & Kite could waste the material excavated by them. The record shows that subsequent to December 24, 1953, Bales & Kite excavated 197,000 yards of material and elected to waste the material along the foreshore in a spoilbank riverward of the rock-fill toe.
*94 PLAINTIFF’S REQUIREMENT OF ADDITIONAL BORROW MATERIAL— DISPOSITION OF MATERIAL EXCAVATED UNDER BALES & KITE CONTRACT
29. After plaintiff completed excavation in the disputed area on February 2, 1953, the company moved to the hillside borrow pit for material required in completing construction of the new levee.
30. Thereafter, on February 10, 1953, Mr. Perry estimated that a total of 367,307 cubic yards of impervious and random material was required to complete construction of the new levee; that 234,094 cubic yards was available in the hillside borrow pit; and, that, therefore, 133,212 cubic yards of material would be required from other sources.
31. At the time the above-mentioned estimate was made by Perry, Bales & Kite was then in the process of wasting about 197,000 cubic yards of material in a spoilbank which lay largely in the foreshore area riverward of the rock-fill toe. As best it can be determined from conflicting and unclear testimony, and a confused record, some of the material was stacked on a portion of the 1 on 100 berm section slope, as shown on the typical cross section on Sheet No. 8 of the plans between station 210 and approximately station 237; some of the material was placed on the overlapping end, i.e., the slope designated as not being steeper than 1 on 2; and an undeterminable, but apparently a substantial, amount of such material either rolled, fell or was placed on a portion of the disputed area which plaintiff previously had excavated to elevation 722.
32. On February 11, 1953, Mr. Perry noted in his daily diary that:
* * * * *
Erickson instructed me to negotiate with Bennett Co. for borrow between ASB & Hannibal Bridge — Mr. Bennett was contacted and he said he would give it some consideration and let us know later.
Also discussed with Erickson about dressing up spoil pile on foreshore bar with Bales & Kite — No action taken until we settle with Bennett.
33. Under date of March 2, 1953, the Bennett Company wrote a letter to the project engineer, Mr. Perry, advising *95 that although more than enough borrow material had been originally supplied, the 1952 flood had washed away so much material that there was not enough left to complete the work. Bennett pointed out that even with the use of the material removed between the Hannibal and A-S-B Bridges river-ward of the right-of-way construction limits as shown on the plans, a need for 402,783 cubic yards of material to complete the work still existed.
CHANGE ORDER NO. 21 RELATING TO TLAINTIEp’s CONTRACT
34. (a) Subsequent to March 2, 1953, the Bennett Company obtained sufficient fill material from a hillside borrow pit to complete the new levee. In compensation for this additional work, defendant issued Change Order No. 21, dated August 5, 1955, increasing the contract price in the lump sum of $72,114.88, for an unspecified amount of material. The change was accepted by plaintiff, and said amount was paid to him.
(b) Change Order No. 21 provided in pertinent part as follows:
Beference is made to Article 3 of your Contract No. DA-23-028-ENG-631, dated 15 June 1951, for Construction of Levee and Appurtenances, * * *
It has been determined that in view of the fact that the hillside borrow area made available by the Government must be increased in size and used as a substitute source of material for construction of portions of the levee and landside'berm because floods washed away part of the foreshore between Stations 290 + 00 and 336+00 heretofore specified to be excavated and used as embankment material, it is necessary and in the best interest of the Government to modify said contract in certain particulars as follows:
The Government will enlarge the hillside borrow area so that the Contractor will have a source of material to substitute for that specified to be obtained from the foreshore areas between Stations 290+00 and 336+00 but washed away by floods in April 1952. The Contractor shall furnish all additional plant, labor, materials, work and services, including overhaul and resultant necessary safety services at highway and railroad crossings, required to construct portions of the levee from the substituted borrow area.
*96 Payment to the Contractor for the additional work and services required by reason of the foregoing modification of said contract will be made under the following lump sum price item which is hereby added to Article 1 of the contract:
Item No. 57 — Utilize additional hillside borrow area for the lump sum amount of Seventy-Two Thousand One Hundred Fourteen Dollars and Eighty-Eight Cents ($72,114.88).
There will be no change in either the estimated quantities or unit price per cubic yard for the Impervious Fill or Random Fill items constructed from materials obtained in the substitute borrow area.
All materials and workmanship for the above-described work shall be in strict accordance with the applicable provisions of the contract specifications and drawings as modified herein and as directed by the Contracting Officer.
It is understood and agreed that on account of the foregoing modification of said contract additional time will not be allowed.
# # % Jfc #
All other terms and conditions of said contract as it heretofore may have been modified shall be and remain the same.
35. (a) The Bales & Kite Contract was amended on April 2, 1953, by Change Order No. 2 which was directed to said company and reads in pertinent part:
Reference is made to Article 3 of your Contract No. DA-23-028-ENG-1516, dated 3 November 1953, for Excavation and Bank Stabilization, Part II, Channel Improvement, Missouri River Unit, located on the left bank of the Missouri River in the vicinity of the Hannibal and A.S.B. Bridges, North Kansas City, Missouri, Kansas Citys Flood Control Project.
It has been determined that in view of the fact that the spoil bank, which lies riverward of the rock toe trench, must be removed since its present position constitutes a hazard to the flood protective structure due to potential diversion of flow against the structure during flood stages with attendant excessive velocities and turbulence, it is necesary and in the best interest of the Government to modify said contract in certain particulars as follows:
The Contractor shall furnish all plant, labor, equipment, and materials and perform all work necessary to *97 dress up the area riverward of the rock toe trench between Stations 200+00 and 237+70 by removing the existing spoil bank and disposing of the material in the excavated trench and adjacent areas. The work shall be performed in accordance with details shown on unnumbered drawing dated 5 March 1953, entitled “Channel Improvement, Missouri River Unit, Back Fill of Rock Toe.” Compaction of the material placed in the trench and adjacent areas is not required. The afore-men-tioned drawing is attached hereto and made a part hereof.
ífí # # ❖ #
Payment to the Contractor for the additional plant, labor, equipment, and materials required by reason of the foregoing modification of said contract will be made at the following unit price which is hereby added to Article 1 of the contract:

(b) Following Change Order No. 2, the material or spoil-bank was cleared and placed into the toe trench by Bales & Kite. After this had been done, the finished elevation was higher than that to which the Bennett Company had been required to excavate and leave as the finished grade and slope.
36. Prior to the time Change Order No. 2 to the Bales & Kite contract was issued, Mr. Elson of the Bennett Company protested to the project engineer, Mr. Perry, about the obvious inconsistency in requiring the Bennett Company to excavate to elevation 722 and turn the area over to Bales & Kite, and then allowing Bales & Kite to waste 197,000 cubic yards of material in a spoilbank which covered the finished grade of 722. Although Perry knew at that time about the shortage of borrow and had taken up that shortage with the contracting officer, he did not recall, at the time he testified during the trial, of raising any question as to the propriety of pushing back into a trench some 197,000 cubic yards of material which the contracting officer later said was originally intended for use on the levee.
*98 PLAINTIFF’S CLAIM AND DENIAL BT CONTRACTING OFFICER
37. Under date of February 13, 1954, plaintiff sent a written claim to defendant’s project engineer, covering three separate items, and requested a conference to discuss the details thereof. On May 7, 1954, the district engineer denied the claims referred to in that letter, and advised the Bennett Company of its right to appeal within thirty days. Thereafter, on May 27, 1954, the Bennett Company sent a letter to the project engineer which reads in pertinent part:
Beference is made to our letter of February 13, 1954 in which we attempted to establish our claim for $286,625.69 under the subject contract.
*****
We recognize the concept and presentation of the original claim was partially in error, and therefore we have requested revision of our claim as originally presented in order that we may present three separate claims, the component parts of which, we believe, clearly substantiate the additional work done by us.
The nature of the claims constituting the component parts of the original claim are as follows:
‡ ‡ ‡ ‡
2. Excavation and overhaul of material beyond the construction right of way limits between station 209+10 and station 231+50: 189,648 cubic yards at 79 station overhaul, 14,982,192 station yards at y2 cent per station yard; plus excavation of 189,648 cubic yards at $1,075 per cubic yard, less contract unit price for random fill _$195,337.44.
38. (a) In a letter sent to plaintiff under date of September 29, 1954, the contracting officer rendered his decision on component 2, which is the subject matter of the present action, stating in pertinent part:
Beference is made to your letter dated May 27, 1954, addressed to the Project Engineer, Kansas City Flood Control Project, * * *.
This letter is confined to consideration of that item of claim (designated Component No. 2) in the amount of $195,337.44. * * *
Component No. 2 of your claim was first brought up in your letter dated December 18, 1952, addressed to the Project Engineer in which you said:
*99 “We interpret the plans to mean that our riverward limits of borrow excavation between sta 210+40 to 242+80 is the line shown on the typical section approximately 260 feet riverward of centerline.
“We propose to excavate as typical section shown on a 1 on 2 slope starting at 220 feet riverward of center-line to the elevation 722.0 and then riverward to the line shown as riverward limit of borrow excavation and construction R/W limit.
“If any excavation is required beyond these limits as stated above we shall expect a modification to the original contract.”
The Project Engineer informed you, by letter dated 24 December 1952, that:
“* * * this office interprets the contract plans and specifications (specifically paragraph 2-06<2(3) of the specifications and the typical cross section, Station 210+40 to Station 242+80 on Sheet 8 of the contract plans) as requiring the excavation of the foreshore borrow to elevation 738.0 at the levee toe with approximately 1% slope riverward to a point 220 feet riverward of the levee centerline, down on 1 on 2 slope to elevation 722.0, then riverward at elevation 722.0 to intersection with the river bank.
“In view of the above, it is not necessary to modify the original contract.”
I am in agreement with the interpretation and opinion of the Project Engineer. Consequently, your claim in the amount of $195,337.44 must be and is hereby denied.
In the event you are not satisfied with this decision, your attention is invited to your right of appeal within 30 days under Article 6 of the contract.
(b) An appeal, received by the contracting officer on October 28, 1954, was taken by plaintiff to said officer’s decision of September 29, 1954. It appears that on February 23, 1955, the contracting officer issued findings of fact denying plaintiff’s claim and that plaintiff responded thereto under date of March 21, 1955. Then, on February 21, 1956, the contracting officer issued revised findings of fact,[10] and the covering letter transmitting such findings to plaintiff reads in pertinent part:
* * * The inclosed findings of fact supersedes the findings of fact dated 23 February 1955 which covered *100 the aforementioned claim and your claim, now settled, involving loss of borrow material due to floods.
Your comments, set forth in your response dated 21 March 1955 to the superseded findings of fact, have been incorporated in the instant findings of fact. Neither the superseded findings of fact nor your response thereto will be forwarded with your appeal. Copies of the inclosed findings of fact will be forwarded. Should you care to submit any comments in connection with the inclosed findings of fact, those comments will be forwarded with your appeal. It is anticipated that the appeal will be forwarded about 9 March 1956.
(c) The contracting officer’s revised findings of fact dated February 2, 1956, read in part:
* * * The contractor contends that the riverward limit of construction right-of-way and borrow excavation required by the contract is approximately 260 feet from centerline. The Government contends that the contract requires the removal of material from the entire foreshore area to specified lines and grades. * * * The issue can be stated as follows: “Does the contract require the contractor to remove borrow material from the entire foreshore area riverward of levee stations 210+40 to 242 + 80 or is the riverward limit of construction right-of-way and borrow area a line approximately 260 feet riverward of the levee centerline?”[11]
(d) Paragraph 9 of the contracting officer’s revised findings of fact, dated February 21, 1956, reads as follows:
The typical section referred to in the note labeled “A” on Exhibit 9 is the section on Exhibit 9[12] entitled “Typical Cross Section — STA. 210+40 to ST A. 242+ 80.” That is the view which serves as the basis for the contractor’s allegation that the riverward limit of borrow excavation and construction Ii/W limit is approximately 260 feet from the centerline. It is a large view, drawn to scale, with both horizontal and vertical dimensions. Break lines are shown between horizontal distances 1+40 and 2+20. No break lines are shown river- *101 ward of the vertical line marked 2+20 (the point 220 feet riverward from the levee centerline). At the extreme right of the section, at a point just to the left of the vertical coordinate line representing the point 260 feet river side of the levee centerline, is another vertical line which has been encircled in red and labeled “B”. The line labeled “B” is identified by note as being “River-ward limit of borrow excavation and construction R/W limit.” The Contracting Officer considers that the vertical line labeled “B” is a vertical projection of the point of intersection of the existing ground line (river bank) and a plane at elevation 722.0 which is the elevation of the lower limit of the borrow excavation. The actual point of intersection of the river bank and elevation 722.0 varies considerably in horizontal distance from the levee centerline. The Contracting Officer further considers that the riverward limit of borrow excavation and construction right-of-way is a variable line with respect to the levee centerline and is determined solely by the trace of the line representing the intersection of the river bank and the plane at elevation 722.0. The contractor contends that the typical section, being to scale, represents the riverward limit of borrow excavation and construction right-of-way as being a fixed distance from the levee centerline and that there is no indication that that limit line varies in distance from the levee centerline.
(e) On April 20, 1956, the contracting officer issued a supplemental set of findings of fact,[13] and paragraph 9 of his findings of February 21, 1956, was supplemented by Paragraph 9(a) which reads:
Attached to this Supplementary Findings of Fact as Exhibit 17 [14] is a copy of sheet No. A-10-2401 of the contract drawings, the same drawing which is attached to the [original] Findings of Fact as Exhibit 8. There has been superimposed on Exhibit 17 a red line approximately 260' riverward of the levee centerline. The hatched area which indicates borrow area extends as much as 60 feet riverward of the red line or 320 feet riverward of the levee centerline which is more distant *102 from the levee centerline than the 300 foot distance mentioned in the response to the Findings of Fact. The riverward edge of the borrow pit as depicted on Exhibit 8 is not parallel to the levee centerline as it would have been had a riverward limit of 260 feet from the center-line been intended for the borrow area.
(f) The contracting officer did not find that plaintiff’s interpretation of the contract was unreasonable; that the plans and specifications were not susceptible of more than one interpretation; nor that plaintiff had not reasonably and in fact construed the plans and specifications as claimed. The contracting officer simply chose his own interpretation over plaintiff’s.
PROCEEDINGS BEFORE, AND DECISION BY, CORPS OF ENGINEERS CLAIMS AND APPEALS BOARD
39. (a) Subsequent to the time the contracting officer denied plaintiff’s claim for additional compensation for extra excavation work and issued his supplemental findings of fact on April 20, 1956, plaintiff prosecuted timely appeal to the Corps of Engineers Claims and Appeals Board under the standard “Disputes” article of Contract 631.
(b) The Board held a hearing on plaintiff’s appeal on February 11 and 12, 1957, and in Eng. C. & A. Board Decision No. 1029, rendered on June 24, 1957, it denied plaintiff’s appeal.[15] The Board’s decision contains a brief preliminary statement concerning the nature of the controversy, sets forth plaintiff’s contention with respect to his interpretation of the pertinent contract specifications, quotes Subparagraph 2.06a(2) (a), (b), (c), and (d) of the specifications, as modified by Addendum No. 3 (see finding 3(f), supra), shows a small-sized reproduction of original drawing “Sheet No. 8” (without red shaded areas, lines, letters and other markings that appear on the copy of Sheet No. 8 which was received in evidence in the instant case as Joint Exhibit No. 1A-B — (see footnote 1), and reads in pertinent part:
The question presented for decision is simple: Does the contract require that the contractor remove material *103 from the foreshore area riverward of the new levee between stations 210+40 and 242 + 80, (a) to intersection of elevation 722.0 with the river bank, or (b) to a line parallel with and approximately 260 feet distant from the levee centerline ?
Before exploring the question, it seems desirable to discuss the type of job involved and criteria for measuring the work thereon. A levee construction job is essentially “grading” work, involving excavation, movement and placement of materials, predominantly earthen, from one or more locations to a fixed location. The vertical, or elevation, limits of such work are fixed by reference to a datum plane, in this case U.S. Coast and Geodetic Survey mean sea level datum. The horizontal or lateral limits of such work are measured from a working base line which is used as the control, e.g., centerline of a levee or highway, or side of a structure, such as the river-face of a floodwall or outside wall of a building. The control base line in this case was new levee centerline, and the dispute concerns only the fixing of the lateral limit of work therefrom. There are two methods for fixing lateral limits: (1) Establish a fixed distance from the base line as the work limit, which, appellant asserts, was the method here adopted. If that method is used, then the elevations or slopes must be accommodated to the fixed lateral limit; (2) Fix the elevations or slopes and let the lateral work limit fall where it may.
Grading jobs may specify either method, or both in combination. Method of combination might, for example, involve a requirement that a contractor grade and construct a levee or highway to a fixed elevation and to a specified distance from centerline, and then slope variably, to “day-light” on a ravine, creek or river. But the two methods, singly or in combination as described, are the only means we know for fixing lateral limits to grading work.
Proceeding to the case at hand, the specifications (2-06a (2) (Addendum 3)) provide, in substance, that the contractor is to remove materials from the foreshore to the limits shown on the drawings. So much of the pertinent drawing as covers plan view and typical section for stations 210+40 to 242-+80 has been reproduced in this decision.[16] The plan view shows the foreshore area be *104 tween the stations mentioned. A 220' dimension is shown on the pian view, immediately to the right and below the 210+00 station, fixing certain work between the centerline of the new levee and a parallel line 220 feet distant on the river side. There is no similar dimension for work riverward of the 220' width referred to, but there is a heavy line, varying in distance from levee cen-terline, which marks the outside limit of borrow excavation.
Before studying the typical cross-section, it may be well to define what a typical cross-section comprises; what purpose it serves. A typical cross-section, as we understand it, is a pictorial representation of controlling conditions within designated limits. By its very name, it cannot be said to be exactly representative of conditions at every point along the alignment involved. An exactly representative cross-section would simply be labeled as “cross-section” for a particular station.
The typical cross-section for Stations 210+40 to 242 +80 shows, in light line, the existing conditions and, in heavy line, the excavation and embankment work to be accomplished by the contractor. Excavation is shown carried to indicated slopes and elevations. So far as concerns the outside limit of excavation, the drawing shows a heavy line, at elevation 722.0, running out to a line which represents river bank and, at the point of such intersection, a dash-dot vertical line marked “Biverward limit of borrow excavation and construction B/W limit.” No dimension fixing that lateral limit of excavation is shown. A horizontal scale is shown, however, under the typical cross-section.
Appellant’s position, and the gravamen of his claim, is that the typical cross-section is to scale and that the outside limit of work is fixed, by the dash-dot line referenced to such scale, at 260 feet from levee centerline. Beferring to the horizontal distances indicated immediately below the typical cross-section, he points out that break lines are shown between the horizontal distances 1+20 and 2+20, but not between 2+20 and the dash-dot vertical line, which is practically on the 2+60 distance mark. ■ From this, he argues that the limit line is a fixed distance laterally from the levee centerline, and that such distance is fixed by the scale at 260 feet. He also points out that, in another typical cross-section, no vertical limit line is shown at the intersection of existing ground line and lower borrow line, and suggests that, in such other case, the riverward limit line varies whereas, here, the *105 addition of the dash-dot vertical line can serve no other purpose, and have no other meaning, than to set a specific limit.
We have already pointed ont that there are, essentially, two methods for fixing limits as to work of this type. The method of fixed distance from base line was actually used in this case, as we have stated? by providing a fixed width of 220' on the plan, by dimension, for certain excavation riverward from levee centerline. No fixed width was dimensioned on the plan, however, for work riverward of such excavation. The question is whether the combination of vertical dash-dot line on the typical cross-section and the horizontal distance scale under that section provides a fixed width for work, equally with the 220 foot dimension on the plan, previously referred to. We answer that question in the negative. Reiterating our understanding of a typical cross-section, it represents a pictorial representation of controlling conditions within designated limits, and cannot be considered as exactly representative of conditions at every point along the alignment involved. Accordingly, we cannot accept the proposition that a horizontal scale under such a section provides a vehicle for the fixing of lateral limits to work. It requires more than that; certainly more than a dash-dot line intersecting that scale, on a typical cross-section. If a lateral limit of work is to be fixed by distance from a base line, rather than by elevation, then we look for an indication by fixed dimension. It cannot be found in this case. In view of the above, we find that the lateral limit of excavation, between stations 210-|-40 and 242 + 80, is fixed by the trace of a line representing the intersection of the plane at elevation 722.0 with the river bank.
Other points, not hereinabove covered, were advanced by the contractor in support of his position, but they are subsidiary to his position above-described. The decisive issue is as to the correct interpretation of the plans and. specifications and, in essence, of the typical cross-section involved. Upon the basis of our interpretation, we must, and do hereby, DENY the contractor’s appeal.
(c) The transcript of the proceedings before the Board was not introduced in evidence in the instant case; therefore, it is impossible to determine what testimony and evidence was presented to the Board on behalf of either the plaintiff or defendant.
*106 (d) The Board did not make a finding on the quantity of material excavated from the disputed area by plaintiff subsequent to December 24, 1952.[17]
(e) On July 17, 1957, plaintiff moved for reconsideration of the Board’s decision of June 24, 1957. After considering plaintiff’s motion and supporting brief, defendant’s brief in opposition to the motion, plaintiff’s reply to defendant’s brief, and holding oral argument, the Board on December 13, 1957, denied plaintiff’s motion for reconsideration.
PLAINTIFF’S PETITION
40. Plaintiff filed his original petition herein on April 11, 1958. On December 12, 1958, plaintiff filed a first amended petition. In both petitions, plaintiff claimed additional compensation in the amount of $195,837.44 for removing and hauling 189,648 cubic yards of material. As noted in finding 26, supra, and footnote 9, the parties subsequently agreed and stipulated that a figure of 105,870 cubic yards of material be used as a basis for plaintiff’s claim. It was developed and established on the record at the trial that plaintiff had been paid for excavating 105,870 cubic yards of material at the contract rate of $0.44 cents a cubic yard, or a total of $46,582.80. Plaintiff, without objection of defendant and with permission of the commissioner, was allowed to amend his petition to reflect the claim as being in the amount of $215,517.68, less a credit to defendant of $46,582.80, already paid to plaintiff, leaving a claim by him in the total amount of $168,934.88.
TESTIMONY OF EXPERT WITNESSES
41. Colonel Robert E. M. deslslets, retired, testified as an expert witness on behalf of plaintiff at the trial of this case. Colonel deslslets graduated from West Point with a B.S. *107 degree in engineering, holds a masters degree in engineering from Cornell University, served over twenty-five years as a commissioned officer in the Corps of Engineers which he left in 1953, held the position of District Engineer for Kansas City during 1943 and 1944, wrote the text and taught the subjects of river, harbor, and flood control in the Corps of Engineers School for about two years after World War II, and is now engaged in civil practice with the State of Ohio.
After examining the plans and specifications for Contract 631, particularly Sheet No. 8 (Joint Exhibit 14 — B), including the plan view and typical cross sections shown thereon, and the final version of Subparagraph 2.06a (2) of the contract specifications, Colonel deslslets expressed the opinion that the riverward limit of required excavation under said contract was definitely shown on Sheet No. 8 by the vertical dash-dot line on the typical cross section between stations 210+40 to 242+80 which delineates a line approximately 260 feet riverward of, and parallel to, the centerline of the new levee.
Colonel deslslets had excellent qualifications, thoroughly explained his reasons for arriving at the opinion expressed by him, made a very impressive witness, and presented credible testimony which is accorded a great deal of weight.
42. Dr. Adrian Pauw testified as an expert witness on behalf of the defendant during the trial of this case, at which time he was Professor of Civil Engineering at the University of Missouri. This witness holds a B.S. degree in civil engineering from the University of Washington and, prior to entering the Navy in 1942, he was employed by the Washington State Highway Department and the Bureau of Reclamation in Colorado. Subsequent to his discharge from the Navy in 1946, Dr. Pauw engaged hi corporate engineering work for a short time and studied for his doctorate degree which he obtained in 1953. He has engaged in private consultation practice primarily in structural construction work and had some experience in the field of soil mechanics. He did not hold himself out as an expert in levee construction work. While Dr. Pauw has had past experience with construction contract drawings, plans and *108 specifications, this was not one of his major areas of engineering activity at the time he testified.
Prior to the trial, Dr. Pauw examined Sheet No. 8 (Joint Exhibit 14-B) of the contract drawings and the revised specifications. Dr. Pauw expressed the opinion that on the basis of his interpretation of the specifications and drawings, specifically Sheet No. 8, the contractor was required to excavate all material above elevation 722 between the end of the 1 on 2 slope and the riverbant, i.e., to excavate river-ward past the 260-foot line on to river stream.
In explanation and support of his aforestated opinion, Dr. Pauw referred to the two cross sections labeled “Typical Cross Sections” which appear on Sheet No. 8. One of these cross sections is for the area between stations 210+40 and 242+80, and he testified that said cross section shows, among other things, the levee, riprap, borrow area from which the material, or most of it, is to be obtained; and that the intention of the cross section is to show what the levee should look like when finished.
Sheet No. 8 also shows a plane view, or “plan” on which an area marked “borrow area” appears. As indicated here-inbefore, subsequent to the time plaintiff completed excavation of the disputed area, this area was colored in red on the drawing to designate the area from which plaintiff removed borrow material down to elevation 722. Because that borrow area is so marked and is outlined by a heavy line, this witness considered the borrow area to extend riverward, or beyond the 260-foot point from the centerline of the levee. He did not feel that the “typical cross section” limited the area to be excavated.
While other individuals might interpret the plans and specifications in the same manner as Dr. Pauw and agree with his stated conclusions, it cannot be found that the latter’s interpretation is correct, or the only reasonable one.
43. Mr. Ordo F. Berges, a registered engineer with over 23 years’ experience in the employ of the Corps of Engineers, who was defendant’s field engineer during the performance of Contract 631, testified on behalf of defendant. Defendant disputes the inference drawn by plaintiff from Berges’ testimony to the effect he was in agreement with plaintiff’s in *109 terpretation tliat tbe vertical dash-clot line on the typical cross section for the area between stations 210+40 and 242+80 shown on Sheet No. 8 established the limits of excavation in that area. Berges, referring to the typical cross section between stations 242+80 and 257+00 shown on Sheet No. 8, testified that the riverward limit of excavation between said stations was shown by the vertical dash-dot line on said cross section to be approximately 217 feet, more or less, river-ward, depending upon where the excavation “toed out”, down to elevation 722.
While on the basis of testimony presented by Berges, coupled with other testimony of record, an argument may be made that the inference suggested by plaintiff is a reasonable one, a conclusive finding to that effect is not supported by the record.
44. As noted in finding 19 (b), supra, J. M. McCann was the individual who supervised the preparation of the contract plans, including Sheet No. 8. He is a registered engineer with about forty years’ experience, which includes employment with the Missouri State Highway Department, his own private engineering practice and, since 1943, employment with the Corps of Engineers. He testified on behalf of the defendant and stated, in substance and effect, that the typical cross section between stations 210+40 and 242+80 on Sheet No. 8 represented the characteristics of the work to be done in those limits; that the plans were drawn up in a manner consistent with his intention to show that the disputed area would be required excavation; that the intent of the contract drawings must be determined by a joint reading of both the cross sections and plan view; that it is accepted practice in the engineering profession in drawing construction plans to indicate the finished work by lines somew'hat heavier in weight than existing condition, such as found on the “plan” view shown on Sheet No. 8; that two heavy lines appear on the plan portion of this drawing; that in his opinion, considering those heavy lines and the line marked “O” on the pertinent typical cross section shown on Sheet No. 8, the plans indicate that the riverward limit of the borrow excavation is the intersection of the plane at elevation 722 with the *110 existing ground at the same elevation; and that anyone examining the sets prior to bidding should have realized that the area to be excavated under the contract included the disputed borrow area.
McCann admitted that the plans were possibly subject to different interpretations, but he expressed the opinion that there was no necessity to alert a contractor, other than by means of the plans and specifications in question, to the possible requirement that he excavate the foreshore area shown in red on Sheet No. 8 (Joint Exhibit 14-B) to elevation 722 at the heavy line appearing on the plan view. He also admitted that the vertical dash-dot line with an arrow and a legend identifying it as the riverward limit of borrow excavation and construction right-of-way, which appears on both typical cross sections, i.e., one for stations 210+40 to 242+80 and one for stations 242+80 and 257+00, shown on Sheet No. 8, have the same meaning in both of said cross sections. McCann’s testimony is not accorded as much weight as that presented by Colonel deslslets.
45. There is a direct conflict in the testimony presented by Mr. McCann and other witnesses on the question as to whether Sheet No. 8 of the plans indicates that the riverward limit of the borrow excavation was the intersection of the elevation 722 with the heavy line in the “plan” or “borrow area”. Mr. McCann’s testimony is not considered conclusive of the foregoing question, and it has not been established by the weight of the evidence that the riverward limit of required borrow excavation would be as stated by him and claimed by defendant. To the contrary, the heavy random line around the red shaded area on Sheet No. 8 is neither elevation 722 nor an exact indication of anything. It is merely an approximate line purporting to represent the intersection of land and water at some arbitrary time, under normal conditions, that would vary from time to time and allow the slope indicated as not steeper than 1 on 2 to vary. There is a proposed finished 722 elevation line at the bottom of the 1 on 2 slope which runs parallel to the centerline of the levee; but the plan does not show a line representing an original 722 contour.
*111 DAMAGES
46. In summary, plaintiff contends that its interpretation of the contract was reasonable; that it relied on that interpretation in bidding and performing work on the contract; that it was required by defendant to remove 105,870 cubic yards of borrow material from the foreshore bar area that it did not originally contemplate removing and was not required to remove under the terms of the contract; that it was then required to haul this material an average of 7,900 feet and use it in the landside berm of the new levee although the average haul for excavation under the contract was 800 feet; that the material had to be excavated and moved in wet and cold weather under most unfavorable conditions; that the reasonable cost of said work was $215,517.68; that it has been paid by defendant for removing 105,870 cubic yards of additional material from the disputed area at the contract rate of $0.44 cents per cubic yard, or a total amount of $46,582.80; and that, therefore, it is entitled to damages in the sum of $168,934.88, plus interest.
47. (a) An accurate computation of plaintiff’s actual additional costs to perform the excavation in the disputed borrow area is not possible, primarily because plaintiff’s employees destroyed all accounting records prior to December 31,1954, including records pertinent to plaintiff’s claim herein. Thus, the amount of damages claimed by plaintiff, the amount allowed by defendant, and the amount computed hereinafter, are speculative in nature and primarily based on estimations.
(b) The parties are in agreement that the daily reports and field journals relating to the contract work, which were maintained by the Corps of Engineers, show the equipment that was used, the amount of material excavated, and that plaintiff performed excavation in the disputed foreshore borrow area over a forty-one day period of time extending from December 24,1952 through February 2,1953. The parties are in substantial, though not complete, agreement that plaintiff actually performed work on thirty-five and one-half days during that period, and the evidence shows said figure *112 to be reasonably correct. The evidence shows that the average workday was approximately ten hours during said period of time. The estimated costs of fuel, oil, grease and wage rates were stipulated by the parties and are not in dispute.
48. (a) The principal dispute between the parties relating to the computation of damages involves the question as to the proper equipment rates to be used in lieu of actual equipment costs.
(b) In computing his damages, plaintiff used, as a factor, equipment rental rates known as “force account rates.” These were special emergency flood rates, which, in May 1952, the Corps of Engineers established and allowed specifically for flood contract work performed by various contractors who performed work in the nearby Fairfax area during an eleven-day flood period in April 1952.[18] The rates are based on the hourly rental of the equipment used and more nearly resembled daily rental rates that are very high.
(c) Plaintiff contends that the conditions under which the disputed excavation was performed beyond the 260-foot line by the Bennett Company from December 24, 1952 to February 2, 1953, were comparable to those under which various contractors performed work arising out of the above-mentioned flood period in April 1952, for which they were compensated on the basis of “force account rates”; that expenses over and above normally expected excavation expenses were incurred in performing the work, principally because (1) it was not the type of work normally encountered in other excavation work on the levee, (2) the work was done under cold winter weather conditions, (3) the equipment was operated on an accelerated basis hr sand, silt, mud and frozen material which increased depreciation, wear and tear, and repairs on the equipment, (4) extra equipment was required, and (5) the material had to be hauled a longer distance than the average distance of other material excavated under the contract; that the work was performed by contractors during said flood period, was similar to that done by plaintiff in connection *113 with excavation of the disputed area; and that, therefore, the use of “force account rates”, rather than normal ownership rates, is justified and necessary in order for plaintiff to be properly compensated for the extra work performed.
49. Plaintiff’s computation of damages, prepared by the Bennett Company’s former engineer, Elson, using emergency hourly rental rates, i.e., “force account rates”, as a factor is summarized below:[19]

50. (a) Defendant disputes that the conditions existing, difficulties encountered, and extra expenses incurred by plaintiff in connection with excavation of the disputed area justify plaintiff’s use of emergency, hourly rental, “force account rates”, as a factor in arriving at a reasonable estimate of plaintiff’s equipment costs and in determining the value of the additional excavation. Defendant contends that plaintiff contemplated working during the winter of 1952-1953 anyway; that the difficulties encountered in performing the extra excavation were no greater than could be expected in the course of constructing a levee immediately adjacent to *114 a river; and that such difficulties should have been anticipated and considered by plaintiff in estimating the cost of the work and submitting his bid.
(b) In computing plaintiff's costs of excavation in the disputed area, defendant used the schedules and percentage rates set forth in the Contractor’s Equipment Ownership Expense Manual (Fourth Edition — 1956), published by the Associated General Contractors of America, Inc. Such rates (hereinafter referred to as “AGC rates”) represent monthly ownership expense as opposed to, and contrasted with, hourly rental rates. Defendant contends that the AGC rates are more appropriate for application than those used by plaintiff.[20]
(c) Defendant also contends that plaintiff’s computation of the cost of the excavation performed at the disputed borrow area is overstated with respect to the number of hours claimed for equipment and personnel.
51. (a) Defendant’s computation of plaintiff’s cost of the disputed excavation, using the AGC rates as a factor, is summarized below:[21]

(b) Plaintiff stipulated agreement to the “fuel, oil and grease” expense shown in the above summary as totaling $12,033.50. (See second sheet of Defendant’s Exhibit 8.)
(c) In the absence of plaintiff’s books and records, the labor hours used in arriving at the labor expense, reflected *115 by tbe summary in the total amount of $24,463.69, were obtained from the Corps of Engineers inspector’s diaries. Defendant’s schedules do not show any allowance for “standby” time, and defendant contends that no such time should be considered as having been established because of the unavailability of plaintiff’s books and records.
(d) Defendant’s Exhibit 8 shows an allowance of $4,352.39 for “overhead”. Defendant’s requested finding 27 reflects a figure of $1,918.45 for said item. In explanation of the foregoing, defendant states that the 5 percent overhead allowance was originally and inadvertently applied to both equipment and non-equipment expense; that the 5 percent overhead allowance properly should apply only to the non-equipment expense because the AGC rates include overhead factors; and that, therefore, $2,433.94 of the original overhead allowance was excluded, resulting in a reduced figure for overhead of $1,918.45.
(e) Defendant’s schedules and computation do not show any allowance for “profit”. In explanation, defendant states that “Plaintiff appears to view its claim as being one for unliquidated damages for breach of contract,” and that, therefore, plaintiff is not entitled to profit on his damages.
(f) Defendant’s schedules do not include an allowance for “interest” and defendant contends interest is not an allowable item of recovery.
52. (a) Plaintiff contends, for reasons set forth in finding 48(c), supra, that AGC rates are inappropriate to the work involved in the disputed area. The foreword to the AGC Manual does make it clear that the percentage rates suggested therein represent average costs of owning and maintaining construction equipment; that the rates are subject to adjustment to meet the experience of the individual contractor; that consideration should be given to the factor, among others, of equipment replacement costs and repairs; that depreciation rates are based on operation under the wear and tear of average job conditions; that the basic factors justifying adjustment of the rates shown are “weather conditions, job location, length of construction season, type of work and care of equipment, both in operation' and maintenance.” *116 Many items of costs are not included in the manual, such as operating cost, labor, material, and minor repairs.
(b) Plaintiff also specifically objects to defendant’s computation of plaintiff’s reasonable costs of excavation on the grounds that defendant’s accountants, who participated in the preparation of plaintiff’s “Schedule of Computed Costs of Excavation (Period December 24, 1952 to February 2, 1958) ” (Defendant’s Exhibit 8), used the AGC rates because “they were told to”; that they did not make any adjustments mentioned in the foreword of the AGC Manual because of their unfamiliarity with the conditions under which plaintiff performed the work in controversy; and that, therefore, the schedules in Defendant’s Exhibit 8 are incorrect, unreliable and inapplicable.
53. (a) Defendant sharply disputes plaintiff’s contentions to the effect that the nature of the disputed excavation required a type of operation that involved work which was not normal to that generally encountered in other excavation work on the levee; that the work was performed under abnormally unfavorable, and adverse weather and working conditions; that greater difficulties and delays were encountered than could be anticipated under the contract; that hauling expense was greater than originally and reasonably estimated; and that, because of the above-stated reasons, higher than normal equipment expense and other excavation costs were incurred for which plaintiff is entitled to compensation in the amount claimed.
(b) Considerable testimony of a conflicting nature was presented and other evidence introduced with respect to the foregoing matters. The record does show that much of the material excavated consisted of wet, cold mud, sand and silt; that the work was done in alternating freezing and thawing weather; that it rained and snowed during the period of excavation; that plaintiff used drag lines and Euclid hauling equipment in removing material from the disputed area; that at times some of the Euclid wagons, normally self-propelled, had to be pushed by bulldozers; that approximately half of the work was done below the water table with the result that a substantial part of the work was done *117 in water; that the exposure of equipment resulted in more wear and tear on the equipment than would have occurred in other seasons of the year; and that plaintiff incurred higher than normal excavation expenses.
(c) The record also shows that the river elevation did not exceed elevation 722 at any time during the period between December 24, 1952 and February 2, 1953; that weather conditions were not unusual for the winter season in this area; that plaintiff did not encounter extraordinary difficulties and unfavorable working conditions, or experience delays, to the extent claimed; that the work performed was not substantially different from that ordinarily involved in normal levee construction work done in the winter months; and that the work was not performed under difficulties and emergency conditions which might be considered comparable to those that prevailed during the flood period in April 1952.
54. Considering the whole record, it is concluded and found that the weight of the evidence supports plaintiff’s contention that he incurred higher than normal expenses in excavating the material in the borrow area in dispute; that, however, defendant’s computation of damages,[22] involving the application of AGO equipment ownership rates as a factor, was fair, reasonable and, in fact, extremely generous, for the following reasons:
(a) Much of the equipment was not used by plaintiff in the disputed area for the entire forty-one days allowed by defendant. When not used in said area during those days, the equipment often was utilized in performing work in other areas covered by the contract. Although one of the drag-lines, the 4 DW-lO’s and one dozer were not used at the disputed site until January 16, 1953, defendant allowed plaintiff payment for the operation of said equipment for the full forty-one days. The six dozers allowed for the full forty-one days actually worked at the same time on only one day, the average use in the disputed area being 3 to 4 dozers daily during said forty-one day period. Although plaintiff contends that the cat and roller equipment was in continuous use in the disputed area during the forty-one day period, the *118 daily reports do not support this contention and show that the equipment was in the area only a few days, but plaintiff was allowed payment for the use of the equipment for forty-one full days. ;
(b) The equipment cost, used as a basis for computing the rates, was apparently for new equipment at that time, (1952) and not necessarily plaintiff’s actual cost, which could increase the total somewhat above actual ownership cost.
(c) The use of monthly rates rather than hourly rates is the most accurate and a reasonable method since the equipment, for the most part, was present on a month-to-month basis, being at the site prior to this specific excavation and remaining thereafter to complete the other contract work.
(d) The wages defendant allowed were generous in that they allow a rate of about six hours daily for regular pay and four hours for overtime pay, rather than the normal eight hours with two hours overtime. Further, defendant allowed an oiler not specifically claimed by plaintiff in its amended claim.
(e) In view of plaintiff’s failure to present any evidence as to actual cost from its books and records, the use of AGO equipment ownership rates appears to be a more reasonable estimate than hourly rental rates for emergency work.
55. Plaintiff’s computation of damages[23] appears to be excessively estimated not only because of hourly, emergency work equipment rental rates (force account rates),[24] but also for tire following reasons:
(a) Where the number and identities of items of equipment are agreed upon as herein, this also automatically compensates for the contention that additional equipment was necessary over that which would reasonably have been used.
(b) The standby costs claimed by plaintiff totaling $27,-790.10 are unsupported hr the evidence.
(c) The estimated wages claimed were based on the average of from twelve to more than fourteen hours of work per day rather than on the ten hour average agreed upon.
*119 SUMMARY — ULTIMATE FINDINGS
56. The complete administrative record, including that made before the Corps of Engineers Claims and Appeals Board, is not before the court because such record, as a whole, was not available for introduction in evidence at the trial. In the proceedings in this court, both parties introduced new evidence; defendant’s objection to de novo consideration of plaintiff’s claim was not raised until July 3, 1963, proof in this case having been closed on February 27, 1963.
57. Upon consideration of the whole record before the court, it is found, in summary, as follows:
ON THE ISSUE OP LIABILITY
(a) Plaintiff’s company, on the basis of its interpretation of the final contract plans and specifications, concluded that the limit of borrow excavation, and the construction right-of-way limit on the riverward side of the levee between the A-S-B and Hannibal Bridges, as established by the plans and specifications, was a line approximately 260 feet from, and parallel to, the centerline of the new levee. Plaintiff construed the final plans and specifications as permitting or allowing the removal of earth from the foreshore bar between stations 210+40 and 242 + 80 riverward of a line 260 feet distant from the centerline of the new levee, but not as requiring excavation of said area.
(b) Plaintiff’s company did not consider that the plans drawn and furnished by defendant were deficient, incomplete, unclear, ambiguous, or subject to a construction different from the one given to them by plaintiff.
(c) Plaintiff’s company prepared its bid, and planned and performed the contract work, in a manner consistent with its interpretation and construction of the contract plans and specifications.
(d) The plans and specifications were fairly susceptible of the construction given to them by the plaintiff’s company, and its interpretation thereof was reasonable under the circumstances in this case.
*120 (e) While the Corps of Engineers Claims and Appeals Board disagreed with, and interpreted the plans and specifications in a manner different from, plaintiff’s construction thereof, the Board did not specifically find that the plans and specifications were not fairly susceptible of the construction given to them by plaintiff or that plaintiff’s interpretation was unreasonable.
ON THE ISSUE OE REASONABLE COSTS 0E THE ADDITIONAL EXCAVATION
(f) It is reasonably concluded that if plaintiff’s company had construed the plans and specifications as requiring excavation of the foreshore bar area between stations 210+40 and 242+80 beyond the 260-foot line to an elevation of 122, it would have planned and performed the disputed excavation work in a different manner than was done and would have had less expense than was actually incurred.
(g) Plaintiff’s company excavated and removed 105,870 cubic yards of borrow material from the foreshore bar area in dispute that it did not originally contemplate removing, or consider that it was required to move, under its construction of the contract plans and specifications.
(h) As a result of difficulties and conditions encountered during the course of performing the disputed excavation, plaintiff incurred additional and higher than normal expenses than plaintiff, under its original construction of the contract, reasonably estimated would be necessary.
(i) The difficulties and conditions encountered by plaintiff in performing the disputed excavation do not justify the application of special emergency, hourly equipment rental rates, i.e., “force account rates”, as a cost factor in computing the estimated reasonable value of the disputed excavation performed by plaintiff. Plaintiff’s estimate is excessively stated, not only because of the use of hourly emergency work, equipment rental rates, but for other reasons set forth in detail in finding 55, supra.
(j) The application of the Associated General Contractors (AGC) equipment ownership expense rates as a cost factor in defendant’s computation of the estimated reasonable value of performing the disputed excavation is reasonable and *121 appropriate under all the facts and circumstances in this case. Defendant’s estimate of plaintiff’s cost is more reasonable than that submitted by plaintiff.
CONCLUSION or law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment is therefore entered for plaintiff in the amount of fifty-two thousand four hundred thirty-six dollars and sixty-three cents ($52,436.63).

 The commissioner found plaintiff entitled to total damages of $88,966.25. The indicated figure of $42,383.45 represents the balance due after deduction of $46,582.80 — this latter amount representing a prior payment at the contract price for the disputed additional excavation.

 Equipment ownership rates published by the Associated General Contractors of America, Inc. The reference here is to the Contractor’s Equipment Ownership Expense Manual (4th ed. 1956). This manual contains a compilation of data showing the average costs to contractors of owning and maintaining construction equipment. The manual provides an “expense per working month percent” for each piece of standard construction equipment.

 This refers to special emergency rates established by the Corps of Engineers in May 1952 specifically for flood contract work in the nearby Fairfax, Kansas, area. The rates were based upon the hourly rental of the equipment for the 11-day flood period.

 In Salt, plaintiff advocated the use of rates based upon the rental value of Its equipment, computed In accordance with rates set forth In the Associated Equipment Distributors Manual (referred to generally as AED rates). The opinion makes note of the fact that the AED rates were designed for use by those whose business consists of equipment leasing and distribution. It also points out that annual rental rates greatly exceed actual acquisition costs and when applied to equipment which has been depreciated in whole or in part would distort the damages which might conceivably have been sustained.

 Average AGC rates are by no means stringent or unrealistic. Annual equipment expense, which these rates seek to define, encompasses depreciation, major repairs and overhauling, interest on the investment, storage, incidentals and equipment overhead, and insurance and taxes. In certain situations, actual costs may in fact be less than those allowed under AGC rates. See Hall Constr. Co., supra; Perini Corp. v. United States, Ct. Cl. No. 228-58 (Commissioner Gamer’s report, Nov. 30, 1965, footnote 11).

 The commissioner allowed plaintiff $12,033.50 for fuel, oil, and grease— this amount having been agreed upon by the parties. Labor overhead, i.e., taxes and insurance, was computed at $1,871.72, and an additional $1,918.45 was allowed as a 5 percent general overhead cost (exclusive of equipment).

 Plaintiff’s direct costs, as found by the commissioner, amount to $88,966.25. See finding 51. Based upon our allowance of 5 percent for home office overhead, plaintiff is entitled to an additional $4,448.31, thereby making his total cost $93,414.56.

 This amount is based upon the following:
Total cost as found by our commissioner_ $88, 966. 25
Plus : 5 percent added for “home office” overhead_,- 4, 448. 31
Subtotal_ 93, 414. 56
Plus : 6 percent profit allowance_ 5, 604. 87
Total_ 99, 019. 43
Less: Amount paidi at contract price___ 46, 582. 80
Balance due_ 521, 436. 63

 The contract, including the specifications, together with all change orders and extra work orders, was received in evidence as Joint Exhibit No. 40.

 Plaintiff’s bid was finally prepared subsequent to the date of Addendum No. 3, and submitted on June 5, 1951.

 The disputed area is colored in red on a plan dated January 1951, and entitled “North Kansas City Unit — Section II — General Plan, Profile and Typical Cross Sections — Sheet No. 8,” which was received in evidence as Joint Exhibit No. 11 — B (hereinafter sometimes referred to as “Sheet No. 8”).

 The original copy of Sheet No. 8 of the plans examined by Elson did not show areas shaded in red or other red lines and letters as appear on Joint Exhibit 14-B. See footnote 3.

 Defendant argues that if plaintiff interpreted the plans as contended in the manner explained by Elson, then plaintiff misinterpreted the plans; that the typical cross section for the disputed area shown on Sheet No. 8 must be considered in connection with the “plan view” (particularly at the foreshore bar area) appearing on the same drawing; that it was, or should have been, obvious to plaintiff that the heavy line on said plan view represented the limit of construction; and that if plaintiff noted an inconsistency between the plan view and typical cross section for the same area, he was obligated under the contract to seek clarification of the matter before submitting a bid.

 The original version of Subparagraph 2-06a(2) of the specifications is quoted in finding 3(b) supra; and said subparagraph, as amended by Addendum No. 3, is set forth in finding 3 (f), supra.

 Defendant disputes that the evidence shows an estimated 56-7,799 cubic yards of material was washed away. The commissioner found said figure approximately correct on the basis of unrebutted testimony presented on behalf of plaintiff. This amount of material was lost during the flood and as a result thereof, defendant thereafter permitted plaintiff to obtain approximately 600,000 cubic yards of material from the government's “hillside" borrow area.

 The Bales & Kite contract was received in evidence as Plaintiff’s Exhibit 8, over the objections of defendant on the grounds of relevancy, materiality, and competency. In brief summary, defendant points out the undisputed fact that the Bales & Kite contract was awarded over two years after the award of the Bennett contract; that the wort and changes in the work under the Bales & Kite contract followed by some months the work done by plaintiff; and argues that “the government is entitled to change its mind and award even inconsistent contracts, provided there does not occur actual interference or prevention of performance by one or the other contractor.” The record does disclose that two floods occurred during the intervening time between the award of *90 the Bennett contract and the award of the Bales & Kite contract. It well may be that these floods could have affected both the rlverbanks and the plans of the defendant’s engineers to cope with conditions on the stretch of the river involved In the instant case; but there Is no record support for affirmative findings of this nature. It is undisputed that levees are constantly being redesigned, reconstructed and rebuilt by defendant. However, without some explanation in the record of the inconsistency between the requirements- of the Bales & Kite contract and defendant’s interpretation of the Bennett contract, it appears that certain inferences unfavorable to defendant reasonably may be made. Furthermore, the record shows, as set out in findings, infra, that certain work performed under the Bales & Kite contract affected the work done by the Bennett Company. For the foregoing reasons, among others, the commissioner considered the Bales & Kite contract to be in some degree relevant to the issues in the instant case.

 Plaintiff originally claimed that he removed approximately 189,648 cubic yards from the disputed area. During the trial of this case, the parties reached agreement and stipulated that plaintiff removed 105,870 cubic yards of material.

 This set of findings was received in evidence in the instant case as Joint Exhibit No. 27.

 It is the position of the plaintiff that “The issue in this case is not whether one interpretation is right or wrong, but rather, whether the plans ana specifications drawn by the government were reasonably susceptible of the interpretation which the contractor actually and reasonably gave to them, and thereafter followed.”

 This exhibit is the same drawing identified as Sheet No. 8 which was received in evidence in the instant case as Joint Exhibit 14-B. (See finding 4, supra, and footnote 1.)

 This set of findings was received in evidence in the instant case as Joint Exhibit No. 28.

 This exhibit (drawing) is attached to Joint Exhibit No. 28 and it is the same as the drawing identified as Sheet No. 1, which was received in evidence in the instant case as Joint Exhibit 14-A, except that no red line appears on the latter exhibit as was superimposed on Exhibit 17 attached to the above-quoted contracting officer's supplementary finding 9(a).

 A certified copy, of this decision was received in evidence as Joint Exhibit No. 35.

 This plan was reproduced from Sheet No. 8 of the plans; but it does not show the colored! letters and markings that appear on the copy of Sheet No. 8 which was received in evidence in this ease as Joint Exhibit 14 — B.

 The preliminary part of the decision does recite that “compliance with the Contracting Officer’s requirement necessitated that appellant remove an estimated quantity of 189,648 cubic yards of material lying between the 260-foot line and the river for which he requested $1.03 additional per cubic yard, or $195,337.44however, the foregoing statement does not appear under the portion of the report captioned “Decision” ; and considering said statement in proper context, it is clear that the Board did not actually find as a fact that plaintiff had excavated said quantity of material. Furthermore, as noted in finding 25, supra, the parties are in agreement that plaintiff removed 105,870 cubic yards of material.

 The rates in question are contained in a document entitled “Equipment Rental Rates for Short Period Rental During April 1952 Flood,” which is included in documentary material received in evidence as Plaintiff’s Exhibit No. 7.

 A detailed computation of plaintiff’s damages is set forth in “Table I” incorporated in plaintiff’s requested finding 39. This table shows, inter alia, the equipment used, the number of hours the equipment was operated, and the length of time required to complete the disputed excavation. The table also reflects the actual number of standby hours claimed for each piece of equipment used, and plaintiff made a reduction in the hourly rate for standby time. The equipment rate is for fully operated equipment. The basis for the separately stated total non-operating labor costs is included in the table. It will be noted that the table includes factors for overhead and profit. Plaintiff also contends he is entitled to interest on the amount of Ms claim.

 See finding 51, infra and footnote 21.

 Defendant’s computation is set forth in detail in Defendant’s Exhibit 8, which was prepared on the basis of an accounting investigation and analysis made by two Special Agents of the Federal Bureau of Investigation who used the AGC rates. (See defendant’s requested findings 26, 27, and explanatory “Memorandum” relating thereto.) The schedules in Defendant’s Exhibit 8 were prepared as a result of plaintiff’s second submission under old Rule 28(b).

 See finding 50, supra.

 See finding 49, supra.

 See finding 48(b), supra.